In re VISTA EYECARE, INC., f/k/a
National Vision Associates,
Ltd., et al., Debtors.

Vista Eyecare, Inc., Movant,

v.

Myrel Neumann, Respondent.

No. 00–65214.

United States Bankruptcy Court,
N.D. Georgia,
Atlanta Division.

Aug. 13, 2002.

Joel B. Piassick, Michael D. Langford, Kilpatrick Stockton LLP, Atlanta, GA, for Debtor/Movant.

Scott T. Larison, Hall and Byers, PA, St. Cloud, MN, James H. Rollins, Holland & Knight LLP, Atlanta, GA, for Creditor/Respondent.

### FINDINGS OF FACT AND CONCLU-SIONS OF LAW ON OBJECTION OF DEBTORS TO PROOF OF CLAIM OF MYREL NEUMANN

JAMES E. MASSEY, Bankruptcy Judge.

Vista Eyecare, Inc., formerly known as National Vision Associates, Ltd., ("Vista") and related Debtors object to proof of claim no. 947, which asserts a general unsecured claim in the amount of $900,000, on the grounds that the claim is unenforceable under O.C.G.A. § 14–2–640 or must be subordinated to the claims of general unsecured creditors pursuant to 11 U.S.C. § 510(b). RCG Carpathia Master Fund, Ltd., as assignee of Myrel Neumann, filed the proof of claim on November 29, 2000 and subsequently reassigned it to Neumann. The Court held an evidentiary hearing on the objection on April 25, 2002. Pursuant to Rule 52 of the Federal Rules of Civil Procedure made applicable by Rule 7052 of the Federal Rules of Bankruptcy Procedure, the Court makes these findings of fact and conclusions of law. The Court has included in its findings of fact, the facts to which the parties stipulated in the Consolidated Pretrial Order dated April 24, 2002.

Vista sells eyeglasses and contact lenses and provides optical and optometric goods and services. It calls its shops "vision centers," which it operates as stand-alone stores in shopping centers and malls and as host departments in Wal–Mart stores. In 1997, Vista began a plan to diversify its revenue base by acquiring chains in the free-standing optical market. Vista is, and was from 1997 through the petition date, a reporting company under the Securities and Exchange Act of 1934.

In the fall of 1997, Vista purchased all of the outstanding stock of Midwest Vision, Inc. from Myrel Neumann, whose entrepreneurship grew out of his profession as a doctor of optometry. Midwest operated 51 retail optical stores and one optical lab. Dr. Neumann was represented by legal counsel in connection with the transaction.

Dr. Neumann did not initiate the transaction. A broker working with Vista had contacted him and arranged a meeting with Vista's president. Thereafter the parties began to negotiate a deal. In making a proposal to acquire Dr. Neumann's stock in Midwest, the components of consideration offered by Vista included cash, a note, Vista common stock, a covenant not to compete and an employment contract.

Dr. Neumann initially resisted accepting stock in Vista as part of the purchase price

and wanted more cash instead. Vista resisted his demands, and he changed his mind. Under the Stock Purchase Agreement, dated September 15, 1997, the final consideration (which had been subject to accounting adjustments) paid to Dr. Neumann for the capital stock of Midwest included $1,860,000 in cash, a promissory note for $620,000, an employment agreement, including a payment for a covenant not to compete, valued at $658,000, one hundred thousand unregistered shares of common stock of Vista and a put option with respect to those shares, the terms of which were set forth in a Put Option Agreement dated October 1, 1997. The parties stipulated that this consideration had "an aggregate stated face value of between $3,838,000 and $4,038,000." Thus, the "stated" value of the stock and put option was between $700,000 and $900,000. The Stock Purchase Agreement valued the stock, providing that each share of Vista stock issued to Dr. Neumann "shall have a value equal to the closing sale price" of Vista's common stock reported on NAS-DAQ's Automatic Quotation System on the closing date of the transaction. Dr. Neumann testified that for income tax purposes, he reported a value of $450,000 for the stock.

The Stock Purchase Agreement provided for a legend concerning restrictions on the sale of the 100,000 shares to be placed on the stock certificate. The legend was placed on the stock certificate and stated in part that "[t]he shares represented by this certificate have not been registered under the Securities Act of 1933, as amended (the 'Federal Act'), or the securities laws of any state or other jurisdiction, but have been acquired by the registered owner for purposes of investment...." The legend also stated in part that the shares could not be sold without being registered, unless an exemption was available under applicable securities laws.

The Put Option Agreement provided that Dr. Neumann could exercise the option to put the 100,000 shares to Vista at specified strike prices during either one of two specified exercise periods. During the first exercise period, which began on January 1, 1999 and ended on February 1, 1999, the strike price was $7.00 per share. During the second exercise period, which began on January 1, 2000 and ended on February 1, 2000, the strike price was $9.00 per share. The option was exercisable only if the average closing sale price for publicly traded shares of Vista's common stock, as defined in the Put Option Agreement for periods specified ending on the day before each of the respective exercise periods, was less than the strike price for each such period. The option was not transferrable "except by the laws of descent and distribution" and could only be exercised with respect to the shares received by Dr. Neumann at the closing. The Put Option Agreement provided that it was governed by Georgia law and in particular stated in subparagraph 2(f) that "[Vista] shall have no obligation to make any payment under § 2(e) hereof if such payment would not be permitted under § 14–2–640 of the Georgia Business Corporation Code."

Vista's financial statements filed annually as part of Form 10–K with the U.S. Securities and Exchange Commission showed Dr. Neumann's interest in the company as redeemable common stock, which the accountants inserted in the balance sheet above the equity section and below long-term debt. The accounting treatment has no legal implication other than it correctly reflected that Dr. Neumann held a contingent claim against Vista, in addition to the 100,000 shares of Vista stock.

The put arrangement enabled Vista to acquire Midwest Vision, Inc. without hav-

ing to outlay additional cash in 1997. If its shares traded at prices higher than the strike prices during the two exercise periods, Vista would have avoided having to pay any additional cash to Dr. Neumann. Dr. Neumann testified that he viewed the option agreement as an undertaking by Vista to guarantee him the purchase price for his shares in Midwest. If he had been able to convert the shares to cash in January 2000, Dr. Neumann would have achieved what he contends was his initial goal: a cash sale price $900,000 higher than the value of the consideration other than the securities he had accepted for his stock in Midwest. He was free not to exercise the option, however. Indeed, when asked by the Court whether, if the share price had risen to $20 in January 2000, he would have been in fine shape, Dr. Neumann responded in the affirmative.

After the deal closed, Dr. Neumann was employed by Vista. Shortly after the closing, he purchased additional stock in Vista through a broker. Dr. Neumann elected not to exercise the option at the $7 strike price during January 1999. He testified that he thought waiting an additional year to obtain an additional $200,000 was an investment decision, though in retrospect he felt he may have been "greedy."

In 1999, Vista obtained credit from Foothill Capital Corporation, the terms of which were ultimately embodied in an Amended and Restated Credit Agreement dated as of November 12, 1999. The obligations of Vista to Foothill under this agreement were secured by virtually all of Vista's assets. This facility replaced a credit facility previously provided by First Union National Bank, the terms of which Vista had breached. First Union had transferred its loan to Vista to its workout department. In its Form 10–Q filed with the Securities and Exchange Commission for the quarterly period ending October 2, 1999, Vista reported that it had entered into this agreement after having failed to make a timely payment on its $125 million senior notes, which it subsequently made in the grace period after obtaining the Foothill credit facility. The senior notes were unsecured.

The Foothill credit agreement provided in relevant part that Vista agreed that it would not fail to maintain certain financial covenants detailed in schedule 7.14 to the credit agreement. That schedule required Vista to maintain minimum earnings before interest, taxes, depreciation and amortization ("EBITDA"), which varied from month to month, calculated on a rolling six months' basis. EBITDA is a measure of a firm's cash flow and hence of its liquidity. The credit agreement further provided that Vista could make repurchases of its common stock pursuant to the Put Option Agreement with Dr. Neumann if no default or event of default had occurred and was continuing during the exercise period. The occurrence of a default or an event of default gave Foothill the option of declaring all of Vista's debt to Foothill immediately due and payable.

Vista's liquidity had been deteriorating during 1999 due to poor performance of free standing stores acquired in acquisitions other than the Midwest acquisition. On form 10–Q for its third fiscal quarter ending on October 2, 1999, Vista reported a net loss of approximately $3,000,000, and in its annual report on form 10–K for fiscal 1999 filed with the S.E.C., it reported a loss of more than $17,000,000.

By letter dated December 31, 1999, Dr. Neumann announced to Vista his intent to exercise his rights under the Put Option Agreement. Prior to January 20, 2000, Neumann delivered to Vista his share certificate for the 100,000 shares he received at the 1997 closing and a stock power

executed in blank. In a letter dated January 20, 2000, Dr. Neumann's counsel tendered an Agreement for Exercise and Closing Under Put Option Agreement, also dated January 20, 2000, signed by Dr. Neumann and demanded that Vista pay Dr. Neumann $900,000. Vista never executed that agreement. Dr. Neumann takes the position that upon tendering to Vista the stock certificate with a stock power executed in blank attached and the Agreement for Exercise, he was no longer a shareholder of Vista. Thus, he contends that a sale of the 100,000 shares of common stock took place in January 2000 and that Vista became indebted to him in the amount of $900,000.

Vista's management did not wish to avoid paying Dr. Neumann, and its general counsel had conferred in January with Dr. Neumann concerning the proper procedure for exercising the option. At the January 20, 2000 meeting of Vista's Board of Directors, however, its management advised that the company was still in the process of determining its actual operating results for December 1999 and that it might not be in compliance with its covenants under the Foothill credit agreement. At about the same time, Vista employed an independent firm to value Vista's assets as part of the Board's due diligence in determining if it could authorize payment to Dr. Neumann under section 14–2–640 of the Georgia Business Corporation Code.

By the time Vista's Board of Directors met on February 24, 2000, it had been established that Vista had defaulted on its financial covenants under the Foothill credit agreement. At that meeting, the Board approved payment of $900,000 to Dr. Neumann under the Put Option Agreement, subject to a waiver of its default by Foothill. Vista never asked Foothill for a limited waiver of the default in order to permit it to pay Dr. Neumann under the

Put Option Agreement. Despite some oral indications from Foothill in the first quarter of 2000 that it would waive the financial covenant default, it never did. Nor did it declare the debt immediately due and payable prior to the filing of this case. Vista did not pay Dr. Neumann any amount under the Put Option Agreement. In a report to the audit committee of the Board of Directors dated February 24, 2000, attached to the February 24, 2000 minutes of the meeting of the Board of Directors, Arthur Anderson LLP, Vista's auditors, stated,

> As a result of the Company's debt offering in 1998, the Company is highly leveraged and The Company's ability to make scheduled payments of interest and principal will depend on its future performance and other factors, some of which are beyond its control. Due to the downturn in operations and cash flows for the current year, AA must consider the Company's ability to continue as a going concern through at least 2000 in rendering its audit opinion.

Vista does not contest that in January and February 2000, the value of its assets exceeded its liabilities. During that period, it paid its operating expenses in the usual course of its business when those debts became due without regard to its debt to Foothill, which exceeded $19,000,000. Foothill continued to permit Vista to use cash collected on its receivables and to make credit available for its day-to-day operations. Had Vista paid $900,000 to Dr. Neumann in January or February 2000, its remaining cash was sufficient to pay debts coming due in those two months other than its debt to Foothill.

Vista's Board of Directors held its March meeting on March 17, 2000. The minutes of that meeting, admitted in evidence as Exhibit N–12, state that the Board discussed "ways to increase its li-

quidity on a short-term basis." The minutes also state that Peter Socha, a director, reported on discussions he held with senior note holders about converting some debt to equity. The Board discussed "strategic alternatives" involving the conversion of debt to equity and then "discussed the possibility of causing the Company to file for protection under the bankruptcy laws."

The outstanding principal amount of senior notes was approximately $123,000,000 in 2000, and on April 15, 2000, less than one month after that Board meeting, Vista was obligated to pay $7,500,000 in interest to the senior note holders. On certain days in the first quarter of 2000, the sum of cash on hand plus the undrawn balance under the Foothill credit facility exceeded $7,500,000, and on other days it did not. Vista could have drawn down $7,500,000 only if Foothill agreed to such a draw. Foothill never waived the default, and there is no evidence that it would have advanced funds to pay interest on the senior notes. Without a waiver, payment of any interest would have been a further default under the Foothill credit agreement.

In a Notification of Late Filing on Form NT 10–K filed with the S.E.C. on April 3, 2000, Vista attached a press release in which the company announced its fiscal 1999 loss of $17.2 million and stated that it was not in compliance with certain financial covenants under its credit facility. It attached a condensed balance sheet that did not show the debt to Foothill as a current liability. But that form was not signed by Vista's chief financial officer, who credibly testified that the proper accounting treatment of Foothill's claim after the default was to classify the debt as a current liability.

On April 5, 2000, Vista and various subsidiaries filed petitions under Chapter 11 of the Bankruptcy Code. It scheduled a claim of Dr. Neumann for $900,000.00 as a creditor without marking the claim as disputed, contingent or unliquidated, because that was how it had reflected the put transaction on its books for accounting purposes. How Vista as debtor scheduled its assets and liabilities does not, of course, bind Vista as debtor in possession, in which capacity it is the equivalent of a trustee. *See* 11 U.S.C. § 1107.

Later in April 2000, Vista filed its annual report on form 10–K with the S.E.C., which included with its financial statements, Arthur Anderson LLP's "Report of Independent Public Accountants" dated as of March 17, 2000, except as to the matters concerning the bankruptcy filing as to which the date was April 5, 2000. In its report, Arthur Anderson LLP opined in part as follows:

> The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 3 to the financial statements, the Company incurred a net loss in 1999 and has a working capital deficiency of approximately $11.7 million at January 1, 2000. In addition the Company has filed voluntary petitions with the United States Bankruptcy Court for reorganization under Chapter 11. These matters raise substantial doubt about the Company's ability to continue as a going concern.... The financial statements do not include any adjustments relating to the recoverability and classification of asset carrying amounts or the amount and classification of liabilities that might result should the Company be unable to continue as a going concern.

Debtor's Exhibit 7, p. F–2.

In those financial statements, the debt to Foothill in the amount of $19,292,000 was shown as a current liability. They

also showed shareholder equity of more than $26,000,000, subject to the reservation about the Company's ability to survive as a going concern.

The public market for Vista shares during the periods discussed reflected the deteriorating financial condition of Vista. The closing share price on December 31, 1998 was 5 5/8. A year later on December 31, 1999, the date of Dr. Neumann's letter concerning the exercise of the option, the closing price was 1 1/32 on a volume of 162,700 shares. On January 24, 2000, the closing price was 1 7/16 on a volume of 265,900 shares. On February 24, 2000, the closing price was 2 on a volume of 142,600 shares. On April 4, 2000, the closing price was .75 per share on a volume of 76,800 shares.

Dr. Neumann has not engaged in any fraud in relation to Vista or in any other illegality in relation to Vista. He has neither breached a fiduciary duty in relation to Vista nor engaged in any conduct that has resulted in injury to Vista's creditors. Dr. Neumann has not engaged in any conduct by which Neumann has conferred upon himself an unfair advantage over other creditors of Vista. Dr. Neumann does not seek in his proof of claim damages for misrepresentations made by Vista.

Vista objects to Dr. Neumann's claim on two grounds, the first of which is that "the claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law...." 11 U.S.C. § 502(b)(1). Vista contends that O.C.G.A. § 14–2–640(c)(1) barred it from purchasing its stock from Dr. Neumann because at the relevant times, it would not have been able to pay its debts as they came due in the usual course of business. In the second ground of its objection, Vista asserts that even if Dr. Neumann has an unsecured claim, it is one for damages arising from the purchase or sale of a

security of the Debtor within the meaning of section 510(b) of the Bankruptcy Code, 11 U.S.C. § 510(b), and hence subject to mandatory subordination to the claims of general unsecured creditors. (Vista has abandoned a third ground stated in the objection that the Put Option Agreement constitutes an equity interest rather than a claim.)

Dr. Neumann responds that the Georgia statute did not prohibit Vista from performing the Put Option Agreement because the company was solvent and paying its debts as they came due in January and February 2000. With respect to the second objection, he maintains that Vista's obligation to him is a debt similar to one evidenced by a note and no different from a guarantee, that he had no investment expectation and that his claim is not one for damages arising from the purchase or sale of the Debtor's securities within the meaning of section 510(b).

■ Section 502(a) of the Bankruptcy Code provides in relevant part that "[a] claim, proof of which is filed under section 501 of this title, is deemed to be allowed, unless a party in interest ... objects." 11 U.S.C. § 502(a). When an objection is lodged, the proof of claim "executed and filed in accordance with [the Federal Rules of Bankruptcy Procedure] shall constitute prima facie evidence of the validity and amount of the claim." Fed.R.Bankr.P. 3001(f). Once the objecting party comes forward with evidence that contradicts the facial validity of the claim in some manner, the burden of proving the claim is on the creditor. *In the Matter of Fidelity Holding Co., Ltd.,* 837 F.2d 696 (5th Cir.1988); *In re Polo Club Apartments Assocs. L.P.,* 150 B.R. 840 (Bankr.N.D.Ga.1993). Vista met its burden, and hence the burden of proof on the first issue presented was on Dr. Neumann.

■ The term "claim" is defined by the Bankruptcy Code as a "right to payment." 11 U.S.C. § 101(5). As indicated, the issue in dispute is whether a payment to Dr. Neumann would have been permitted under section 14–2–640 of the Georgia Business Corporation Code in early 2000. If Georgia law did not permit Vista to make a distribution in January 2000 or thereafter to shareholders, such as by repurchasing shares, then Dr. Neumann has no right to payment and hence no claim in Vista's bankruptcy case.

Dr. Neumann asserts that Vista purchased the shares he tendered pursuant to the Put Option Agreement, such that he is no longer a shareholder, in part at least because he delivered the stock certificate and Vista accepted it. Vista held the certificate not because it believed it was authorized to purchase the securities and therefore owed Dr. Neumann $900,000, but rather because its officers and Board hoped to be able to complete the transaction and having the certificate readily available would have facilitated its completion, if and when Vista was authorized by Georgia law to complete it. The shares may have had some value in January 2000; if they still had value but Vista was not permitted by Georgia law to pay Dr. Neumann for those shares, it seems quite unlikely that Dr. Neumann would not be entitled to have the certificate returned to him. For this reason, the Court doubts that the events surrounding Dr. Neumann's attempt to exercise the option divested him of ownership of the shares. It does not matter, however, whether the tender of the certificate by Dr. Neumann and his manifestation of intent to exercise the option combined with Vista's receipt of the certificate had the effect of transferring title to the shares to Vista. Subparagraph (e) makes it plain that Vista's obligation to pay him is limited by subparagraph (f) regardless of whether Dr. Neu-

mann remained a shareholder after exercising his option.

The Georgia Business Corporation Code defines the term "distribution" as including a corporation's purchase or redemption of its own shares. O.C.G.A. § 14–2–140(6). As the parties agreed in the Put Option Agreement, O.C.G.A. § 14–2–640 is applicable to this dispute.

O.C.G.A. § 14–2–640 provides in relevant part:

(a) A board of directors may authorize and the corporation may make distributions to its shareholders subject to restriction by the articles of incorporation and the limitation in subsection (c) of this Code section.

(b) If the board of directors does not fix the record date for determining shareholders entitled to a distribution (other than one involving a purchase, redemption, or other reacquisition of the corporation's shares), it is the date the board of directors authorizes the distribution.

(c) No distribution may be made if, after giving it effect:

(1) The corporation would not be able to pay its debts as they become due in the usual course of business; or

(2) The corporation's total assets would be less than the sum of its total liabilities plus (unless the articles of incorporation permit otherwise) the amount that would be needed, if the corporation were to be dissolved at the time of the distribution, to satisfy the preferential rights upon dissolution of shareholders whose preferential rights are superior to those receiving the distribution.

(d) The board of directors may base a determination that a distribution is not prohibited under subsection (c) of this Code section either on financial statements prepared on the basis of accounting practices and principles that are rea-

sonable in the circumstances or on a fair valuation or other method that is reasonable in the circumstances.

(e) Except as provided in subsection (g) of this Code section, the effect of a distribution under subsection (c) of this Code section is measured:

(1) In the case of distribution by purchase, redemption, or other acquisition of the corporation's shares, as of the earlier of:

(A) The date money or other property is transferred or debt incurred by the corporation; or

(B) The date the shareholder ceases to be a shareholder with respect to the acquired shares;

(2) In the case of any other distribution of indebtedness, as of the date the indebtedness is distributed; and

(3) In all other cases, as of:

(A) The date the distribution is authorized if payment occurs within 120 days after the date of authorization; or

(B) The date the payment is made if it occurs more than 120 days after the date of authorization.

. . .

Section 14–2–640 of the Georgia Business Corporation Code is identical to section 6.40 of the revised Model Business Corporation Act. Subsection (c) sets out two tests that must be satisfied in order for a corporation to make a valid distribution to a shareholder. The first test, whether the corporation will be able to pay its debts as they become due in the usual course of business after giving effect to a distribution, is sometimes referred to as the "equity insolvency test." The second test, sometimes called the "balance sheet test" or the "bankruptcy insolvency test," is not at issue here because Vista does not

contend that its liabilities exceeded the value of its assets in early 2000.

The equity insolvency test, infrequently examined in case law, is discussed in the official comment to section 6.40 of the Revised Model Business Corporation Act. Applying the equity insolvency test requires directors to assess a company's future prospects and is necessarily subjective to a degree and hence a matter of judgment. Its application is not based on one or more formulas that serve to draw bright lines between what is and is not permissible, as the official comment to this section points out:

> Because of the overall judgment required in evaluating the equity insolvency test, no one or more "bright line" tests can be employed. However, in determining whether the equity insolvency test has been met, certain judgments or assumptions as to the future course of the corporation's business are customarily justified, absent clear evidence to the contrary . . . [including] the likelihood that (a) based on existing and contemplated demand for the corporation's products or services, it will be able to generate funds over a period of time sufficient to satisfy its existing and reasonably anticipated obligations as they mature, and (b) indebtedness which matures in the near-term will be refinanced where, on the basis of the corporation's financial condition and future prospects and the general availability of credit to businesses similarly situated, it is reasonable to assume that such refinancing may be accomplished.

R.M.B.C.A. § 6.40 Official Comment.

Dr. Neumann's arguments that Vista was not prohibited from making a distribution to him are flawed. He contends that Vista was authorized to pay him because it in fact made timely payment of debts that came due in January and February 2000.

He argues that because Foothill never demanded payment, the debt to Foothill was not "due" and therefore no obstacle to a distribution and that, as stated by his counsel at trial, if credit facilities due within one year of a proposed distribution are considered "debts as they come due," then most corporations in the country would from time to time be equitably insolvent. He points to Vista's filing on Form NT 10–K on April 3, 2000, showing current assets exceeding current liabilities as evidence that Vista believed it could pay its debts as they came due in early 2000. These arguments tilt strongly in the direction of applying the equity insolvency test as a set of accounting formulas and overlook the statute's direction to consider what the company "would" be able to do in the future.

■ The words "would not be able to pay" in subsection (c)(1) of section 14–2–640 require a board of directors to determine the likelihood that future cash flow will be sufficient to pay debts when they come due. As the official comment to this section of the Model Act points out, the equity insolvency test requires consideration of factors relevant to reaching "a conclusion that known obligations of the corporation can reasonably be expected to be satisfied over the period of time that they will mature." Thus, relevant considerations include whether the enterprise can continue as a going concern and can maintain or replace financing necessary to pay debts as they come due. The time horizon to which a board of directors must look under this section may vary with the circumstances of the particular company, but that horizon extends at least through the date on which a company is obligated to make substantial payments on existing large obligations, particularly if that date will occur within one year of the date of the proposed distribution.

It follows that Dr. Neumann's argument for a permitted distribution based on the company's record of paying day-to-day expenses in early 2000 fails because its time horizon is too short. The argument that most corporations would be deemed equitably insolvent if credit facilities not yet due but due within a year are treated as due is hyperbole. Contrary to the unstated assumption of that argument, the fact that a company's current ratio (current assets divided by current liabilities) is less than 1 does not conclusively establish that it is insolvent under O.C.G.A. 14–2–640(c)(1), although that circumstance would be a red flag. Rather, the equity insolvency test asks whether the debt could be refinanced when it comes due. Hence, a board of directors might decide correctly that a particular distribution is not prohibited if the company can reasonably be expected to be able to replace a credit facility that will come due within one year and the company's ability to pay its debts when due is not called into question for some other reason. What Vista stated in the balance sheet attached to its Form NT 10–K has no probative value because of the circumstances: it was not signed by a financial officer, there was no basis for its treatment of the debt to Foothill as a long term liability, and Vista was two days away from filing bankruptcy because it could not pay its debts as they came due.

Vista was not a healthy company in 1999 and 2000. It incurred losses during 1999, which began to accelerate in the fourth quarter and did not abate in the first quarter of 2000. When 1999 ended, Vista was in default under the Foothill credit agreement, and it remained in default through April 5, 2000, when it filed bankruptcy. Although Foothill did permit Vista to draw on its credit line and use cash collateral in the interim to pay current operating expenses, it never waived the default. The default converted Foothill's

claim into the equivalent of a debt due on demand. Although the minutes of the January and February meetings of Vista's Board suggest that the Board had some hope that the company would pull out of its financial dive, its decision not to perform under the Put Option Agreement without a waiver from Foothill was entirely reasonable and appropriate.

Arthur Anderson LLP stated in its February 24 report to the audit committee of the Board that Vista was highly leveraged and that its ability to make scheduled payments of principal and interest depended on future performance. In other words, Vista had insufficient reserves to make those scheduled payments and its back was to the wall. Anderson suggested that it would qualify the year-end financial statements by expressing doubt about Vista's ability to remain a going concern. The company's cash position was described by Anderson in its year-end audit report dated March 17, 2000 accompanying the financial statements as "a net working capital deficiency of $11.1 million as of January 1, 2000." Net working capital is the difference between current assets and current liabilities. Thus, Anderson treated the debt to Foothill has a current liability. In that same report, Anderson qualified its opinion about the company's financial statements in stating that Vista's ability to operate as a going concern was in doubt. By March 17, 2000, a member of the Board was in discussion with representatives of senior note holders about converting some of that debt to equity, an unnecessary exercise if Vista would have been able to pay its debts when due in the usual course of business, while Dr. Neumann was still asking that his equity be converted to debt. There is no evidence that Vista's financial condition in January or February 2000 was materially better than it was in March or April 2000.

Angus Morrison, Vista's chief financial officer, credibly testified that it was his "strong opinion" that if Vista had paid Dr. Neumann without a waiver of default, Foothill would have called the loan immediately. He further testified that on many days in the weeks prior to April 15, 2000, Vista did not have sufficient cash and available credit under the Foothill credit agreement to make the interest payment to senior note holders on April 15, assuming that Foothill would have permitted Vista to draw on that credit. Unless Foothill waived the default, Vista was prohibited from using its cash to pay interest on the senior notes.

The fact that Foothill had not accelerated the debt on the credit facility at the point in time Dr. Neumann attempted to exercise the option does not redeem Dr. Neumann's case. Foothill's forbearance in not accelerating the debt does not create an inference that it would advance money to Vista indefinitely and for any purpose. Its failure to waive the default after having been requested to do so, however, supports the inferences that it was more likely than not that Foothill would not have permitted Vista to draw on the credit line to pay interest on the senior notes and that causing another default by paying Dr. Neumann would have triggered acceleration of the debt to Foothill. There is no evidence that Vista could have obtained substitute financing if Foothill had called its loan.

Although the Foothill debt was not technically due during January and February 2000, O.C.G.A. § 14-2-640 required the Board to assume that it would come due, there being no evidence that Vista could have cured its default or replaced that credit facility, during the year 2000. The interest debt on the senior notes became due on April 15, 2000, and Vista did not have the means to pay that debt unless

Foothill agreed to advance funds. The Board had no reasonable basis for assuming in the first quarter of 2000 that Foothill would advance funds to pay that unsecured debt and many reasons for assuming that it would not increase its exposure by nearly forty percent. That the Board may not have immediately recognized as early as January or February that it would be unable to pay interest on April 15, or at least mentioned it in the minutes, is beside the point. The Board's view that the key to the company's survival in its immediate future and outside of bankruptcy was a waiver of its default under the Foothill credit agreement was correct. Without a waiver, Vista would have been unable to make the interest payment due on senior notes on April 15.

Based on these facts, the Court finds that when Dr. Neumann first made his demand on Vista to pay him $900,000 in exchange for his stock, Vista would not have been able to pay its debts as they came due in the usual course of its business, whether or not it paid Dr. Neumann. It was not permitted by section 14–2–640 to convert Dr. Neumann's equity to debt and hence is not obligated pay $900,000 to Dr. Neumann, whose claim must be disallowed.

■ The second ground on which the Debtor objects to Dr. Neumann's claim is that if it is allowed, it should not be treated as a general unsecured claim but should be subordinated under section 510(b) of the Bankruptcy Code, which provides:

> For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

If it is assumed that Dr. Neumann held a non-contingent claim against Vista when he tendered his share certificate and purported to exercise the option, the issue under section 510(b) is whether that claim is one for damages arising from the purchase or sale of a security of Vista. On this issue, the Debtor has the burden of proof.

Dr. Neumann argues that his claim is for the balance of the purchase price paid by Vista for his stock in Midwest. He contends that the history and purpose of section 510(b) and the scope of the term "damages" as it is used in the statute limit that section to damages sustained by an investor in equity securities resulting directly from the seller's fraud or other wrongdoing in the actual sale or issuance of those securities. He maintains that he had never had an investment intent or interest in acquiring the shares other than as a means of obtaining his target price for his interest in Midwest.

The idea for the provision in section 510(b) preventing conversion from equity to debt was first described in a law review article by John Slain and Homer Kripke. *See* John Slain & Homer Kripke, *The Interface Between Securities Regulation and Bankruptcy—Allocating the Risk of Illegal Securities Issuance Between Securityholders and the Issuer's Creditors*, 48 N.Y.U.L.Rev. 261 (1973). Congress relied heavily upon the analysis in this article in enacting section 510(b). *See* H.R.Rep. 95–595, 196, 1978 U.S.C.C.A.N. 5963, 6154–6156; *see also In re Geneva Steel Co.*, 281 F.3d 1173, 1176 (10th Cir.2002) (discussing the Slain and Kripke article and its role in the enactment of the 1978 Bankruptcy

Code). In that article, the authors referred only to claims arising from fraud in the sale of securities, but a proper interpretation of section 510(b) requires careful attention to the policy behind its enactment—proper allocation of the risk of insolvency, as well as the risk of fraud, among groups of equity and debt holders.

In the handful of cases involving section 510(b), the courts have discussed the significance of the qualification that a claim be one for damages, whether the words "arising from" limit the scope of that section to conduct of a debtor at the time a purchase or sale of its securities occurs, and whether the claim must arise from fraud or may arise from a breach of contract. *See, e.g. Baroda Hill Investments, Ltd. v. Telegroup, Inc. (In re Telegroup, Inc.)*, 281 F.3d 133 (3d Cir.2002) (Becker, C.J.) (holding that a claim for damages arising from breach of registration agreement is covered by section 510(b)); *In re Granite Partners, L.P.*, 208 B.R. 332 (Bankr.S.D.N.Y.1997) (holding that a claim for post-investment fraud is covered by section 510(b)); *In re Wyeth Co.*, 134 B.R. 920 (Bankr.W.D.Mo.1991) (holding that a claim on notes issued in exchange for a debtor's stock several years before its bankruptcy was not a claim for damages within meaning of section 510(b)); *In re Stern–Slegman–Prins Co.*, 86 B.R. 994 (Bankr.W.D.Mo.1988) (holding that a claim that did not arise from fraud or rescission was not covered by section 510(b)).

■ In *In re Telegroup, Inc., supra*, shareholders of the corporate debtor filed proofs of claim based on the debtor's breach of an agreement to use its best efforts to register its stock in the hands of those shareholders. One of the appellants had sold its assets to the debtor in exchange for the debtor's stock, and the agreement to register the stock was a part of the stock purchase agreement. The

bankruptcy court subordinated the claims pursuant to section 510(b), and the district court affirmed. On appeal to the court of appeals, the shareholders argued that section 510(b) was inapplicable because their claims arose from a breach of the registration agreement over a year after the stock purchase and not from misconduct of the debtor at the time of the closing of the exchange of assets for stock. The Third Circuit, in a decision written by Chief Judge Becker, rejected the claimants' argument, stating:

> Claimants' reading of § 510(b) as requiring the subordination of only those claims alleging fraud or actionable conduct in the issuance not only is plausible as a textual matter, [internal reference omitted], but also has some appeal at an abstract level.... Nonetheless, the distinction that claimants' reading of § 510(b) draws between actionable conduct that occurred at the time of the purchase of the security and actionable conduct that occurred after the purchase seems to us to lack any meaningful basis as a matter of Congressional policy, and therefore provides an inadequate resolution of the ambiguity in the text of § 510(b) as applied to the claims in this case.

*Id.* at 141. It also rejected the argument that because the article by Professors Slain and Kripke as well as legislative history focused on damages arising from fraud, Congress meant to limit section 510(b) to fraud claims. The court noted that in fact the authors of that article "explicitly declined to delineate the exact boundary between those shareholder claims that should be subordinated and those that should not." *Id.* The court noted that many claims could be characterized as either arising in tort or in contract, and saw "no reason as a matter of policy" for making such a distinction. *Id.* at 143.

The policy that section 510(b) addresses is based on the absolute priority rule and the allocation of the risk of insolvency and the risk of fraud in the issuance of securities. The court discussed at length the analysis of Professors Slain and Kripke, on which, it pointed out, Congress relied heavily, that the absolute priority rule "allocates [the risk of insolvency] to shareholders."

> Under the absolute priority rule, "stockholders seeking to recover their investments cannot be paid before provable creditor claims have been satisfied in full." [Slain and Kripke, *supra*,] at 261; *see generally Consol. Rock Prods. Co. v. Du Bois*, 312 U.S. 510, 520–21, 61 S.Ct. 675, 85 L.Ed. 982 (1941) (holding that stockholders cannot participate in a plan of reorganization unless creditors' claims have been satisfied in full); *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939) (same); *see also Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 436 n. 2, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972) (Douglas, J., dissenting) (discussing the history of the absolute priority rule).

*Telegroup*, 281 F.3d at 139. The court concluded that the statute was intended "to prevent disaffected equity investors from recouping their investment losses in parity with general unsecured creditors in the event of bankruptcy." *Id.* at 142. Affirming the lower courts, it held that "a claim for breach of a provision in a stock purchase agreement requiring the issuer to use its best efforts to register its stock arises from the purchase or sale of the stock, and therefore must be subordinated pursuant to § 510(b)." *Id.* at 144. This Court agrees with and adopts the Third Circuit's analysis of section 510(b).

The facts in this case differ slightly from the facts in *Telegroup* in one respect that deserves mention because Dr. Neumann mentioned it but that the Court does not deem material. There, the claimants had no price guarantee from the debtor, while here, the Put Option Agreement was intended to set the minimum amount of money that Dr. Neumann could receive if he disposed of his shares on or before February 1, 2000, subject to the terms of that agreement. A registration agreement and a put option agreement have the same basic purpose, however, which is to permit the shareholder to dispose of his equity investment.

Dr. Neumann attempts to distinguish *Telegroup* by arguing that he "was not an 'investor' in any of the Debtors; rather, Neumann was given the Stock Consideration as part of the purchase price for the sale of his business to the Debtors, with the cash realization of that portion of the purchase price deferred until the occurrence of the 'exercise periods' defined in the Put Option Agreement." Response of Myrel Neumann to Debtors' Amended Objection to Proof of Claim filed April 11, 2002, pp. 2–3.

Factually that argument runs aground because it mischaracterizes the agreement that Dr. Neumann and Vista in fact made. Vista did not agree to guarantee the balance of a purchase price that Dr. Neumann asked for but did not get in his negotiations with Vista. It agreed that it would repurchase its securities at stated prices, subject to the terms of the Put Option Agreement, if Dr. Neumann elected to sell them. Had Vista been able to perform the Put Option Agreement, Dr. Neumann would have realized an additional $900,000, but the possibility of that result does not change the unambiguous terms of the agreement he made. Until the option could be exercised so as to create an obligation of Vista to pay him, Dr. Neumann retained all rights as a

shareholder. He had the right not to exercise the option and to continue to hold the shares. Vista had no corresponding call option, and its obligation to pay depended on its solvency under O.C.G.A. § 14–2–640. What Vista guaranteed was not the purchase price paid to Dr. Neumann for Midwest but the purchase price it would pay for its own securities. Thus, Dr. Neumann's claim falls squarely within the plain language of section 510(b): a claim for "damages arising from the purchase or sale of [a security of the debtor]."

The claim is one for damages. As mentioned earlier, the term "claim" means a "right to payment." 11 U.S.C. § 101(5). Damages are the measure in money of compensation for loss or injury. Black's Law Dictionary, 7th Ed. The word "damages" in section 510(b) does not connote that the claim must arise from fraud. Rather, its use in that section is necessary because a claimant's total claim arising from the purchase or sale of a company's securities may be offset by the value, if any, of those securities still held, or disposed of, by the claimant. (When a publicly traded company files bankruptcy, that does not necessarily mean that its securities are worthless.) For example, if a company refuses to accept shares tendered by a claimant who is a party to a put option agreement with that company, the claimant need not risk a further decline in the market or the possibility that he might never recover from the company but could sell the stock to minimize his loss. In that event, his claim for damages would be the difference between the gross amount owed under the option agreement and the amount received from the sale. If the claimant has not sold his shares, his claim for damages would be the amount of the total obligation if he delivers the stock to the debtor.

When Vista refused to pay Dr. Neumann after he had delivered his share certificate, it breached the contract, assuming that it was obligated to pay him. Because Dr. Neumann did not sell his shares to a third party, his claim for damages did not require a deduction of the value of those shares from the total amount otherwise due under the contract.

Dr. Neumann's claim for damages arose from his purchase of 100,000 shares of common stock of Vista because the Put Option Agreement, out of which the claim is alleged to arise, was an integral part of his agreement to accept Vista's stock as a portion of the consideration for his shares in Midwest. If Dr. Neumann's argument that he sold his shares to Vista and was no longer a shareholder of Vista were correct, then his claim for damages would arise not only from the sale of Vista's shares to him, but from the sale of those shares back to Vista as well.

■ Dr. Neumann also argues that the accounting treatment of the Put Option Agreement is significant because Vista's financial statements disclosed his contingent claim, while the claims in *Telegroup* presumably were not reflected on that company's balance sheet. A hypothetical entity contemplating whether to extend credit to Vista would have had the opportunity to review its balance sheet and to know about the contingent obligation to Dr. Neumann. That opportunity would not be afforded to a creditor who extends credit to a company unaware that a shareholder has a claim against the company for fraud or breach of an agreement to register stock. This distinction made by Dr. Neumann is irrelevant because the purpose of section 510(b) is obviously neither to encourage corporations to disclose liability for misconduct nor to encourage creditors to review financial statements before extending credit. The purpose of section

510(b) is to allocate the risk of insolvency, from whatever cause, to equity holders first by preventing reclassification of equity as debt in the guise of a damage claim arising from the purchase or sale of a debtor's securities. *In re Telegroup, supra; In re NAL Financial Group, Inc.,* 237 B.R. 225, 233 (Bankr.S.D.Fla.1999); *In re Granite Partners, L.P.,* 208 B.R. 332, 336–37 (Bankr.S.D.N.Y.1997).

Dr. Neumann's contention that his motivation was to get the benefit of the deal he wanted to make in the first place obscures the reality that the deal he made involved an investment in Vista's stock. He did not get a note for the additional $900,000 he wanted in exchange for his shares in Midwest; he took shares of common stock instead. The purchase agreement and the share certificate he accepted stated that he was acquiring the shares for investment. He bought additional stock in Vista evidencing his hope and belief that the share price would rise. His testimony that he did not understand that he could have sold the shares without having them registered and that he never considered his purchase of Vista stock an investment lacked credibility, as did his testimony that everyone knew in 1997 that the price of Vista's stock would never rise above $9 per share (though in fact, it never did between September 1997 and April 5, 2000). Unlike an unsecured creditor, Dr. Neumann's equity position afforded him the possibility of making a higher return on his investment than what he would have received had he been able to exercise the option, because he was under no obligation to exercise the put option. That he had an investment motive is confirmed not only by the stock purchase agreement and the legend on the share certificate but also by his admissions that he made an investment decision to hold the stock after January 1999 because he was "greedy" and that he would have been in a fine position had the share price risen to $20. If section 510(b) did not apply to Dr. Neumann's situation, it would allow shareholders in his position "to retain their stock and share in the corporation's profits if the corporation succeeds, and to recover a portion of their investment in parity with creditors if the corporation fails." *Telegroup,* 281 F.3d at 142.

For these reasons, even if Dr. Neumann had a claim against Vista, that claim would be subject to mandatory subordination under section 510(b) of the Bankruptcy Code. The Court will enter a separate judgment.

IT IS SO ORDERED.