**PARATRANSIT RISK RETENTION GROUP INSURANCE COMPANY, f/k/a Paratransit Risk Retention Group of Maryland, Inc., a Tennessee corporation registered to do business in the State of Colorado, Plaintiff–Appellee and Cross–Appellant,**

v.

**Duane H. KAMINS, Defendant–Appellant and Cross–Appellee.**

No. 04CA0905.

Colorado Court of Appeals, Div. IV.

Feb. 22, 2007.

Lapin & Viorst, P.C., Anthony Viorst, Denver, Colorado, for Plaintiff–Appellee and Cross–Appellant.

Mulliken Weiner Karsh Berg & Jolivet, P.C., Murray I. Weiner, Colorado Springs, Colorado, for Defendant–Appellant and Cross–Appellee.

Opinion by Judge FURMAN.

This case concerns a creditor's claims as to distributions made to the sole shareholder of an allegedly insolvent corporation. Defendant, Duane H. Kamins, appeals the judgment finding him liable to plaintiff, Paratransit Risk Retention Group Insurance Company, for the distributions he received. Paratransit cross-appeals the denial of its motion for costs and fees. We reverse the judgment and remand for further proceedings.

## I. Background

Paratransit is a member-owned risk retention group that provides automobile liability insurance to public transportation companies. In February 2000, it filed this action against its insured, Colorado Transportation Services, Inc. (CTS), and Kamins, the sole shareholder and director of CTS. Paratransit alleged that distributions Kamins made to himself rendered CTS insolvent and unable to satisfy its obligations for premiums owed to Paratransit and for unpaid claims for accidents caused by CTS's taxicab drivers.

CTS owned the majority interest in two taxicab companies, American Cab Company of Denver, LLC, and American Cab Company of Colorado Springs, LLC. From October 1995, when those two taxicab companies began operations, and continuing through May 28, 1998, when they were sold, CTS had an insurance contract with Paratransit. The policy provided that CTS would have a self-insured retention (SIR) of $25,000 per accident, and that Paratransit would provide excess liability coverage of up to $475,000 for each claim. The policy stated that the SIR would be CTS's responsibility as the insured, although Paratransit agreed to pay claims for CTS if CTS failed to meet its SIR. In exchange for this agreement, CTS was to pay premiums and provide Paratransit with a $40,000 letter of credit. CTS obtained the letter of credit in September 1997.

Effective May 28, 1998, CTS sold its assets to Coach USA, Inc., ceased operations, and canceled its policy with Paratransit. The $2.4 million proceeds of the sale were deposited into a bank account jointly owned by CTS and Coach (AmCab–Coach account). A portion of the proceeds was used to pay CTS's noncontingent liabilities and its attorney fees, and $100,000 was deposited into an escrow account to pay CTS's creditors.

On June 1, 1998, Kamins transferred $861,563 from the AmCab–Coach account to CTS's Denver operating account.

On June 3, 1998, Kamins transferred $525,000 from CTS to himself, leaving approximately $240,000 in the CTS accounts. On November 30, 1998, Kamins transferred $57,141 from the escrow account to himself, leaving approximately $95,000 in the CTS accounts.

At the time of these transfers, CTS faced unsettled claims for four motor vehicle accidents involving its taxicab drivers. These claims were the primary focus of the litigation in this case, and were referred to at trial as the Naranjo, Ohmes, Sandoval, and Pershing claims.

Before CTS sold the assets of the two cab companies in May 1998, the status of these four claims, as found by the court at the bench trial, was as follows:

1. [Mr.] Naranjo suffered property damage and injuries on 4/29/97, when a CTS taxicab collided with his car. It was undisputed that the CTS driver was at fault. On May 21, 1997, an attorney for Mr. Naranjo contacted Fred Hair, CTS' claims manager, regarding this claim. A quarterly report of American Cab Co., issued on September 11, 1997, shows that Mr. Naranjo had incurred $1,745 in medical expenses as of that date, and that the claim was still open. On March 31, 1998, Dan Thompson [Paratransit's claims manager] sent a letter to Mr. Hair expressing his opinion that the Naranjo claim "may exceed your SIR." On April 3, 1998, Mr. Hair sent a letter to Mr. Thompson acknowledging Mr. Thompson's concern.

2. On February 2, 1998, [Mr.] Ohmes suffered serious injuries when his stationary car was rear-ended by a CTS taxi being driven at a high rate of speed. On March 13, 1998, Fred Hair wrote a letter to Dan Thompson acknowledging that "it is reasonable to expect that the cost of resolving Ohmes' anticipated bodily injury claim will exceed American Cab's self-insured retention." At trial, both Mr. Hair and Kamins acknowledged that, as of February 2, 1998 ... they knew that this claim would exceed CTS' SIR of $25,000.

3. On March 1, 1998, a CTS taxi traveling northbound on an I-25 on-ramp rear-ended a car, being driven by [Mr.] Sandoval, that was merging into traffic at the top of the ramp. Mr. Sandoval also had a passenger in the car. On March 24, 1998, an attorney representing Mr. Sandoval contacted Fred Hair. On April 2, 1998, Fred

Hair sent a letter to Dan Thompson regarding the Sandoval claim, in which he stated that "[d]ue to attorney involvement and the fact that there may be two claimants, settlement of this claim may exceed American Cab's self-insured retention." A handwritten record authored by Mr. Hair on May 21, 1998, reflects that as of that date, Mr. Sandoval had incurred $1,423.73 in medical bills, his passenger had incurred $988.34 in medical bills, and that both potential claimants were still undergoing physical therapy.

4. [Ms.] Pershing was a passenger in a CTS taxicab that was involved in a motor vehicle accident on January 30, 1998. There was no dispute that CTS was responsible for paying any causally-related medical expenses under its $25,000 SIR, and CTS did pay some of Ms. Pershing's medical expenses. However, Duane Kamins did not believe that Ms. Pershing's medical expenses were causally-related to the accident, and made the decision that CTS would stop paying those expenses.

In addition to those claims, in January 2000, Paratransit made a payment for the benefit of Ms. Pearson, who was a passenger in a CTS taxi that was also involved in a motor vehicle accident. The trial court found that CTS never reimbursed Paratransit for this sum.

At trial, Kamins introduced evidence that in late May 1998, he met with his claims manager, Fred Hair, to review CTS's open accident claims files. Hair had evaluated the total claims as greater than $25,000, but less than the $40,000 letter of credit issued for the protection of Paratransit. There was also evidence that prior to 1999, no claim against CTS had exceeded its $25,000 SIR and therefore no payments had been made by Paratransit on behalf of CTS.

The trial court found that, as of May 28, 1998, CTS had contingent liabilities to Paratransit in the amount of $150,500, and that it was "both inaccurate and unreasonable" for Kamins to expect the $40,000 letter of credit would be sufficient to cover the claims. The court also found that Kamins had made additional capital contributions to CTS's accounts after he received the previously noted distri-butions. Based on those and additional findings, the trial court entered judgment in favor of Paratransit, concluding Kamins was liable in two respects: (1) because the payments he made to himself rendered CTS unable to pay its debts as they became due in the usual course of business, he thereby violated § 7–106–401(3)(a), C.R.S.2006; and (2) because he had a fiduciary duty to pay debts owed to all other creditors, he breached that duty by paying himself first.

The trial court awarded Paratransit $102,617 as follows:

| Claim | Dollars Owed |
| --- | --- |
| Naranjo | 8,500 |
| Ohmes | 9,044.50 |
| Sandoval | 25,000 (settlement) |
| | 25,000 (legal expenses) |
| Pershing | 17,846.88 |
| Pearson | 519.82 |
| Premium | 16,706.25 |
| Total | 102,617.45 |

At the conclusion of the trial, the court directed each party to submit proposed findings of fact and conclusions of law. The court later adopted, without amendment, the findings of fact, conclusions of law, and order of judgment submitted by Paratransit.

## II. Amendment of the Complaint

Kamins contends the trial court abused its discretion on the first day of trial by reversing its prior rulings and allowing Paratransit to amend its complaint for a fourth time. We disagree.

Paratransit filed its original complaint against CTS and Kamins in 2000, asserting that CTS breached its contractual obligation to pay for settlements of the Naranjo and Ohmes claims. Shortly thereafter, Paratransit filed an amended complaint and, seven months later, a second amended complaint adding a breach of contract claim arising from the Sandoval matter. The trial was originally set for April 2001, but was continued several times.

In October 2000, the trial court ordered that motions to amend pleadings were to be filed within ninety days; however, in October 2001, the court permitted Paratransit to file a

third amended complaint, alleging that Kamins was personally liable for violations of statutory and fiduciary duties.

In April 2002, Paratransit filed a separate action related to the Pershing claim that was assigned to a different division of the court under a separate case number. However, a month later, the new case was transferred to the original division for a determination of whether "the filing of [the second] complaint [was] proper in light of [the original court's] rulings regarding amendments."

In November 2002, Paratransit requested leave to file a fourth amended complaint deleting references to specific dollar amounts it had paid. The proposed fourth amended complaint, like the previous complaints, contained no reference to the Pershing claim. The court denied Paratransit's motion to file the fourth amended complaint and entered a default judgment against CTS, leaving Kamins as the only defendant. However, on the first day of trial, the court granted Paratransit's oral motion to consolidate the original case and the Pershing case for trial.

### A. Law of the Case

■ Kamins first contends that the trial court's October 2000 case management order prohibited further amendments to the complaint, and, thus, the later order permitting consolidation of the Pershing case violated the law of the case doctrine. We disagree.

■ The law of the case doctrine is a discretionary rule providing that courts must generally follow prior rulings in a case. *In re Estate of Walter*, 97 P.3d 188, 191 (Colo. App.2003). The doctrine applies to decisions of law. It does not apply to findings of fact, *Governor's Ranch Prof. Ctr., Ltd. v. Mercy of Colo., Inc.*, 793 P.2d 648, 650 (Colo.App.1990), or to preliminary or tentative rulings. *In re Estate of Walter, supra*, 97 P.3d at 191.

The trial court's October 2000 case management order in this case was a preliminary ruling to ensure that Kamins was made aware of all claims as soon as possible. Because Kamins was aware of the Pershing claim, the court's later order permitting consolidation of the Pershing case did not violate the law of the case doctrine. *See In re*

*Estate of Walter, supra*, 97 P.3d at 191 (rulings or orders made in the progress of an ongoing proceeding may be rescinded or modified during that proceeding upon proper grounds).

### B. Consolidated Trial

■ We also reject Kamins's related contention that the trial court abused its discretion in allowing Paratransit to consolidate the original case and the Pershing case for trial.

■ Pursuant to C.R.C.P. 42(a), a court may order a joint trial of two actions when they concern a common question of law or fact. A trial court's order as to a joint trial will not be disturbed on review absent a clear showing of abuse of discretion. *Duhon v. Nelson*, 126 P.3d 262 (Colo.App.2005). An abuse of discretion occurs where the failure to order separate proceedings virtually assures prejudice to a party. *Prudential Prop. & Cas. Ins. Co. v. Dist. Court*, 617 P.2d 556 (Colo.1980).

Here, the trial court granted Paratransit's motion for consolidation of the Pershing case before the trial began, after finding that the cases shared similar claims and theories of recovery, and that a joint trial would promote judicial economy. Counsel for Kamins admitted that he did not want to try the Pershing case at a later time, and Kamins has shown no prejudice resulting from the consolidation. Hence, we perceive no abuse of discretion in the trial court's ruling.

### III. Kamins's Liability for Unlawful Distributions

Kamins next contends the trial court erred in concluding he was personally liable to Paratransit for making unlawful distributions to himself. Kamins does not dispute the fact that a director's liability may be based on § 7–108–403, C.R.S.2006. But, he maintains that the trial court erred (1) in finding CTS was insolvent under § 7–106–401, C.R.S. 2006, without measuring insolvency as of the date of each distribution and without appropriately discounting contingent liabilities, and (2) in not considering the "safe harbor" defense under § 7–108–401, C.R.S.2006. We

conclude a remand for further findings is required.

### A. Liability to the Corporation

As a preliminary matter, we note that the Colorado Business Corporation Act, § 7–101–101, et seq., C.R.S.2006, addresses the liability of directors who make distributions when corporations are insolvent. And, as pertinent here, § 7–108–403 provides that a director's liability is *to the corporation:*

> A director who votes for or assents to a distribution made in violation of section 7–106–401 or the articles of incorporation is personally liable *to the corporation* for the amount of the distribution that exceeds what could have been distributed without violating said section or the articles of incorporation if it is established that the director did not perform the director's duties in compliance with section 7–108–401.

Section 7–108–403(1), C.R.S.2006 (emphasis added).

However, in *Ficor, Inc. v. McHugh,* 639 P.2d 385 (Colo.1982), the supreme court considered whether an unpaid creditor could also bring a lawsuit against a corporate director. The court construed a prior version of § 7–5–114(3), which similarly provided that, upon dissolution of a corporation, its directors were liable to *the corporation* for the nonpayment of creditors.

The supreme court held that, where there is only one outstanding creditor, that creditor may bring a lawsuit in his or her own name:

> [D]enying creditors this right would substantially undercut the efficacy of this statute; the corporate existence has been terminated and former directors, officers, or shareholders could be expected to have little interest in instituting such an action. In the instant case, all the former directors, officers, and shareholders are included among the persons against whom recovery is sought.

*Ficor, Inc. v. McHugh, supra,* 639 P.2d at 394.

■ Here, Paratransit filed this action on its own behalf rather than in the name of the corporation. However, as in *Ficor,* it was the only remaining unpaid creditor of CTS, a dissolved corporation. And, as in *Ficor,* denying relief to Paratransit would frustrate the statute's purpose, which is to protect an unpaid creditor of a dissolved corporation when a director makes distributions in violation of § 7–106–401. We therefore conclude that Paratransit may assert a claim against Kamins based on § 7–108–403.

### B. Determining Insolvency Under § 7–106–401

■ We next address Kamins's contention that the company was not insolvent and that the trial court applied an incorrect legal standard in determining otherwise. Kamins maintains that (1) federal bankruptcy courts have adopted an equity insolvency test similar to that found in § 7–106–401(3)(a), and the trial court erred in not analyzing whether CTS was insolvent based upon factors adopted by these courts; (2) the trial court erred by not properly valuing CTS's contingent liabilities; (3) the trial court erred in basing its findings of insolvency on events that occurred after the distributions; and (4) the evidence was insufficient as a matter of law to support a finding of insolvency. We agree that further findings are required using the proper standard, and conclude that we cannot evaluate the sufficiency of the evidence on this record.

■■ As a general rule, whether a company is insolvent at a certain time is a mixed question of law and fact. *Moody v. Sec. Pac. Bus. Credit, Inc.,* 971 F.2d 1056 (3d Cir. 1992). Factual findings are reviewed only for clear error, and the trial court's choice of law and interpretation of legal principles is reviewed de novo. *Universal Minerals, Inc. v. C.A. Hughes & Co.,* 669 F.2d 98 (3d Cir. 1981).

Here, the parties agree that Kamins made shareholder distributions to himself on June 1, 1998, and on November 30, 1998. They also agree the test of insolvency is found in § 7–106–401. At issue here is whether CTS was insolvent at the time Kamins made these two distributions to himself or whether it became insolvent as a result of these distributions.

Kamins contends CTS was not insolvent because CTS was making regular payments to creditors on June 3 and on November 30, 1998. We conclude further findings are required to resolve this issue.

Section 7–106–401 provides in pertinent part:

(1) A board of directors may authorize, and the corporation may make, distributions to its shareholders subject to any restriction in the articles of incorporation and subject to the limitations set forth in subsection (3) of this section.

. . . .

(3) No distribution may be made if, after giving it effect:

(a) The corporation would not be able to pay its debts as they become due in the usual course of business; or

(b) The corporation's total assets would be less than the sum of its total liabilities plus (unless the articles of incorporation permit otherwise) the amount that would be needed, if the corporation were to be dissolved at the time of the distribution, to satisfy the preferential rights upon dissolution of shareholders whose preferential rights are superior to those receiving the distribution.

▉▉▉ Thus, two tests are applicable in determining whether a corporation may make a valid distribution to a shareholder. The first test is whether a distribution will impair the corporation's ability to pay its debts as they become due in the usual course of business. This is referred to as the "equity insolvency test." *See In re Vista Eyecare, Inc.*, 283 B.R. 613 (Bankr.N.D.Ga.2002). The second test is referred to as the "balance sheet test" and is not at issue here.

Section 7–106–401(3) is identical to section 6.40(c) of the Model Business Corporation Act Annotated (2002) (Model Act). Therefore, we may look to the Model Act and federal bankruptcy court cases that have interpreted the Model Act for guidance. *See Indus. Comm'n v. Bd. of County Comm'rs*, 690 P.2d 839 (Colo.1984) (where the provisions and purposes of a state statute parallel those of a federal enactment, federal authorities are highly persuasive).

According to the comments to the Model Act, certain assumptions as to the future course of a corporation's business are justified, absent clear evidence to the contrary. These assumptions include:

the likelihood that (a) based on existing and contemplated demand for the corporation's products or services, it will be able to generate funds over a period of time sufficient to satisfy its existing and reasonably anticipated obligations as they mature, and (b) indebtedness which matures in the near-term will be refinanced where, on the basis of the corporation's financial condition and future prospects and the general availability of credit to businesses similarly situated, it is reasonable to assume that such refinancing may be accomplished.

Model Act § 6.40 cmt. 2; *see In re Vista Eyecare, supra*, 283 B.R. at 622.

▉▉▉ By using the term "regular course of business," the equity insolvency test contemplates that the corporation at issue is still a going concern that is generating or attempting to generate revenue. Thus, when a trial court is confronted with allegations of unlawful distributions, the court normally considers "whether the enterprise can continue as a going concern and can maintain or replace financing necessary to pay debts as they come due." *In re Vista Eyecare, Inc., supra*, 283 B.R. at 623; *see* § 7–106–401(3)(a); Model Act § 6.40 cmt. 2.

▉▉▉ However, when, as here, a corporation no longer generates or attempts to generate revenue, it is not operating in the "regular course of business." Hence, the trial court must consider what the company "would" be able to do in the future, that is, whether it would or "would not be able to pay its debts as they become due." Section 7–106–401(3)(a); *see In re Vista Eyecare, Inc., supra*, 283 B.R. at 623.

### 1. Payment of CTS's Debts as They Become Due

Federal bankruptcy courts apply an equity insolvency test that considers whether a debtor is generally not paying debts as they become due. *See* 11 U.S.C. § 303(h)(1). Be-

cause this test is virtually identical to that contained in § 7–106–401(3)(a), we may look to federal authorities for guidance. *Indus. Comm'n v. Bd. of County Comm'rs, supra.*

Federal bankruptcy courts have looked at the following factors in determining whether a corporation is generally not paying its debts as they become due in the regular course of business: (1) the number of debts unpaid each month compared to those that are paid; (2) the amount of the delinquency; (3) the materiality of the nonpayment; and (4) the nature of the debtor's conduct of its financial affairs. *See In re Leek Corp.,* 52 B.R. 311 (Bankr.M.D.Fla.1985); *see also In re Reed,* 11 B.R. 755 (Bankr.S.D.W.Va.1981).

A bankruptcy court has explained that:

[i]n the final analysis, the determination whether an alleged debtor is generally not paying his or her debts as they become due is a flexible one which admits "no hard and fast rules," and requires a careful balancing of both the number and amount of the unpaid debts, in proportional terms, viewed in the light of the alleged debtor's total financial picture.

*In re Fischer,* 202 B.R. 341, 350 (Bankr. E.D.N.Y.1996) (citations omitted).

Kamins relies on evidence showing that CTS paid hundreds of bills after the June 3, 1998 distribution, and that no bill went unpaid until December 14, 1998, when Paratransit sent CTS a bill for $16,706 for the audited amount of the final premium due. In response, Paratransit contends that while it may have been CTS's only unpaid creditor, it was one of CTS's largest creditors. Thus, Paratransit argues, CTS's payments of its smaller debts did not mean the company was solvent.

We conclude the trial court did not articulate and analyze these federal bankruptcy court factors in determining whether CTS was insolvent at the time of Kamins's distributions to himself.

## 2. Valuing CTS's Contingent Liabilities

Kamins also contends the trial court erred by not properly valuing CTS's contingent liabilities and assuming the maximum possible liability. We agree.

A bankruptcy court has explained the valuation of contingent liabilities as follows:

[C]ontingent liabilities are not valued at their potential face amount; rather "it is necessary to discount it by the probability the contingency will occur and the liability become real." Further, the contingency must be capable of reasonable estimation. "The asset or liability must be reduced to its present, or expected, value before a determination can be made whether the firm's assets exceed its liabilities."

*In re Advanced Telecommc'n Network, Inc.,* 321 B.R. 308, 335 (Bankr.M.D.Fla.2005) (citations omitted) (quoting *In re Chase & Sanborn Corp.,* 904 F.2d 588, 594(11th Cir.1990), and *In re Xonics Photochemical, Inc.,* 841 F.2d 198, 200 (7th Cir.1988)); *see In re Xonics Photochemical, Inc., supra,* 841 F.2d at 200 ("a contingent liability is not certain—and often is highly unlikely—ever to become an actual liability").

The Model Act identifies factors that a court should consider when valuing contingent liabilities:

To the extent that the corporation may be subject to asserted or unasserted contingent liabilities, reasonable judgments as to the likelihood, amount, and time of any recovery against the corporation, after giving consideration to the extent to which the corporation is insured or otherwise protected against loss, may be utilized.

Model Act § 6.40 cmt. 2.

Here, CTS had two different types of contingent liabilities. First, there were the Naranjo, Ohmes, and Sandoval claims. The existence of these obligations was not disputed, but they were contingent because the amount of these obligations depended upon the future settlement of the claims. Second, there was the Pershing claim, where the debt was disputed and not owed until the resolution of the legal action. The trial court found that as of May 28, 1998, when CTS's cab companies were sold, CTS had total contingent liabilities to Paratransit of $150,500.

However, the court valued the contingent liabilities as the maximum amount CTS could be liable for under the open claims. The trial court's findings do not reflect that it

considered whether "reasonable judgments as to the likelihood, amount, and time of recovery" of the claims were made based upon the history of previous claims against CTS. *See* Model Act § 6.40 cmt. 2. Nor did the court consider the probability that the Pershing claim would occur and that the liability would be realized.

Accordingly, we conclude the judgment must be reversed and the case remanded for a proper determination of the value of CTS's contingent liabilities.

### 3. Effect of the Distributions

We also agree with Kamins that the trial court erred in basing its finding of insolvency on events that occurred after the two distributions.

Section 7–106–401(5), C.R.S.2006, provides, in pertinent part:

> Except as provided in subsection (6) of this section, the time for measuring the effect of a distribution under subsection (3) of this section is:
>
> . . .
>
> (c) In all other cases, as of either:
>
> (I) *The date the distribution is authorized,* if the payment occurs within one hundred twenty days after the date of authorization; or
>
> (II) The date the payment is made, if it occurs more than one hundred twenty days after the date of authorization.

(Emphasis added.)

In its written order in this case, the trial court found:

> [A]t the end of the day on June 3, 1998, the 'AmCab–Coach' account had $178,923.10 in it, and the Denver Operating Account had $14,297.66 in it. However, these funds were soon dissipated, and by early September the 'AmCab–Coach' account had less than $23,000 in it and the Denver Operating Account was running a negative balance. Therefore, the Court finds that, at the time of the June 3, 1998 distribution of $525,000 from CTS to Duane Kamins, CTS was no longer able to pay its debts as they became due in the usual course of business.

Although CTS, acting through Duane Kamins, established a $100,000 escrow account for a period of six months, this escrow account never paid off any creditors. Neither Paratransit, nor any other creditor, was ever notified of the existence of this escrow account. And, because the escrow account only existed until November 30, 1998, Paratransit was unable to utilize the funds in the escrow account to pay the outstanding CTS motor vehicle claims, which were not settled until July of 1999 or later.

On November 30, 1998, Duane Kamins, in his capacity as the sole director of CTS, distributed $57,141.51 from the escrow account to himself. At that time, both the 'AmCab–Coach' account and the Denver Operating Account were essentially closed, and CTS bills were being paid from a new account, known as the CTS Account, which had opened in mid-October of 1998. On November 30, 1998, the CTS account held only $202.45. The CTS Account records, in conjunction with Duane Kamins' testimony, reflect that over the next two years, this account was funded by capital contributions that Kamins made, on a periodic basis, to the account. Without Kamins' capital contributions, CTS would not have been able to pay its bills. Therefore, the Court finds that, at the time of the November 30, 1998 distribution of $57,141.51 from CTS to Duane Kamins, CTS was no longer able to pay its debts as they became due in the usual course of business.

However, the parties have not directed us to any evidence in the record showing that the two distributions to Kamins occurred later than 120 days after they were authorized. Thus, the time for measuring the effect of the distributions was the date the corporation authorized the distributions. *See* § 7–106–401(5)(c)(I).

We therefore conclude the trial court erred in finding liability based on the dissipation of funds and account balances from the Am-Cab–Coach account and CTS's Denver operating account after the June 3, 1998 distribution, and based on the capital contributions made after the November 30, 1998 distribution.

On remand, the trial court must make findings as to the information Kamins had at the time of the distributions before determining whether CTS was insolvent, or whether it would become insolvent as a result of the distributions.

■ Accordingly, we reverse the judgment and remand the case to the trial court to determine whether CTS was insolvent, or as a result of the distributions would become insolvent. The court shall make its findings and conclusions by (1) comparing the number of CTS's debts unpaid to those paid, taking into account that the payments of smaller debts do not necessarily mean the company was solvent, *see In re Fischer, supra,* 202 B.R. at 350 (a debtor will be considered insolvent "even though [the] alleged debtor may owe only one debt, or very few debts ... where such debt or debts are sufficiently substantial to establish the generality of the alleged debtor's default"); (2) determining the amount of CTS's delinquency and considering CTS's contingent liabilities as an element of the total debt, *see In re Advanced Telecommc'n Network, Inc., supra;* (3) determining the materiality of the nonpayments, taking into account any unpaid premiums and future dates when payments would have to be made on the outstanding claims, *see In re Vista Eyecare, supra,* 283 B.R. at 623 (the period in which the overall financial picture should be considered "extends at least through the date on which a company is obligated to make substantial payments on existing large obligations"); (4) evaluating CTS's conduct of its financial affairs, considering that CTS was no longer operational, and had no source of income; and (5) limiting its measure of the effect of the distributions to the date each distribution was authorized.

The court should make these determinations, to the extent possible, based upon the existing trial record. However, if it is unable to do so, the court may conduct such further proceedings as are necessary.

### 4. Sufficiency of the Evidence

Kamins also contends that the evidence was insufficient as a matter of law to support a finding that CTS was insolvent. Because we conclude that the trial court did not apply the appropriate standard and make appropriate findings under that standard, we cannot evaluate this contention on appeal. Accordingly, we decline to address the issue in its present posture.

### C. Safe Harbor Defense

We also agree with Kamins that the trial court failed to consider his safe harbor defense under § 7–108–401.

The safe harbor provision of § 7–108–401 provides in relevant part:

(2) In discharging duties, a director or officer is entitled to rely on information, opinions, reports, or statements, including financial statements and other financial data, if prepared or presented by:

(a) One or more officers or employees of the corporation whom the director or officer reasonably believes to be reliable and competent in the matters presented; [or]

(b) Legal counsel, a public accountant, or another person as to matters the director or officer reasonably believes are within such person's professional or expert competence . . . .

. . . .

(4) A director or officer is not liable as such to the corporation or its shareholders for any action the director or officer takes or omits to take as a director or officer, as the case may be, if, in connection with such action or omission, the director or officer performed the duties of the position in compliance with this section.

Comment 2 to § 6.40 of the Model Act likewise provides:

[I]n exercising their judgment, the directors are entitled to rely ... on information, opinions, reports, and statements prepared by others. Ordinarily, they should not be expected to become involved in the details of various analyses or market or economic projections that may be relevant. Judgments must of necessity be made on the basis of information in the hands of the directors when the distribution is authorized. They should not, of course, be held responsible as a matter of hindsight for unforeseen developments.

■■ Initially, we agree with Paratransit's contention that the safe harbor defense is an affirmative defense, but we disagree that it was not adequately raised in the trial court.

■ An affirmative defense "is a legal argument that a defendant, who is capable of being sued, may assert to require the dismissal of a claim or to prevail at trial." *State v. Nieto,* 993 P.2d 493, 507 (Colo.2000).

The safe harbor defense, if successful, would allow Kamins to avoid liability under § 7–108–401(2) and (4), C.R.S.2006. Accordingly, we conclude that it is an affirmative defense.

We further conclude the issue was adequately raised in the trial court. Although Kamins did not include the phrase "safe harbor" in his answer, *see Bob Blake Builders, Inc. v. Gramling,* 18 P.3d 859 (Colo.App. 2001)(a party waives all affirmative defenses not presented in the answer), his proposed trial management order expressly notified Paratransit and the court of his intent to rely on the "proper interpretation and application" of the director liability statutes, which refer to the safe harbor defense in § 7–108–401.

Kamins also argued the applicability of the safe harbor provision of the director liability statutes in his motion to dismiss, and he presented testimony at trial, without objection by Paratransit, detailing his reliance on the advice of his claims manager. We therefore conclude the safe harbor defense was properly before the trial court. *See* C.R.C.P. 15(b) ("When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.").

Alternatively, Paratransit contends that, as a matter of law, Kamins did not carry the burden of proof as to the safe harbor defense. We disagree.

■ To prevail under the safe harbor affirmative defense, a defendant is required to prove each element of the defense. *See In re Sheffield Steel Corp.,* 320 B.R. 423, 451 (Bankr.N.D.Okla.2004).

Kamins introduced evidence at trial that, before he made the June 3, 1998 distribution to himself, he met with his claims manager to discuss the status of CTS's finances and open claims. Kamins testified that he relied on the claims manager's analysis that CTS's contingent liabilities were between $25,000 and $40,000. Kamins argued that, as a director, he was also entitled to rely on the claims manager's expertise, and that he reasonably believed the information he received was reliable and competent. Paratransit's own claims adjuster testified that CTS's claims manager "was a good evaluator" and "very capable."

■ Although the trial court's findings reflect that it considered § 7–108–401, we conclude these findings do not reflect that it considered Kamins's reliance on his claims manager's expertise. We therefore direct the trial court, on remand, to consider Kamins's safe harbor defense and determine from the evidence introduced at trial whether he produced sufficient credible evidence to relieve himself of liability under § 7–108–401(2) and (4).

### IV. Breach of Fiduciary Duty

Kamins also contends the trial court erred in finding that Paratransit had standing to sue for breach of a common law fiduciary duty. We agree this matter must be addressed by the trial court on remand after it resolves the issue of CTS's insolvency.

■ Creditors typically may not bring breach of fiduciary duty claims against corporate directors. *Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.,* 296 F.3d 164 (3d Cir.2002); *In re Reuscher,* 169 B.R. 398 (S.D.Ill.1994); *Prod. Res. Group L.L.C. v. NCT Group, Inc.,* 863 A.2d 772 (Del.Ch.2004). Courts have concluded that contractual agreements and the law of fraudulent conveyance, for example, adequately protect the creditors of going concerns. *See, e.g., Prod. Res. Group L.L.C. v. NCT Group, Inc., supra.*

■ However, a corporation's insolvency alters the dynamics among the corporation, its directors, and its creditors. Directors of an insolvent corporation are deemed to be

trustees for the corporation and for its creditors, *Rosebud Corp. v. Boggio*, 39 Colo.App. 84, 561 P.2d 367 (1977), and therefore, they owe a fiduciary duty to creditors not to divest corporate property for personal benefit, to prefer themselves over other creditors, or to defeat a corporate creditor's claim. *Crowley v. Green*, 148 Colo. 142, 365 P.2d 230 (1961); *Rosebud Corp. v. Boggio, supra.*

█ Because a director's fiduciary duty to corporate creditors arises only upon insolvency, *In re Bruning*, 143 B.R. 253 (D.Colo. 1992), in order for Paratransit to have standing to assert a breach of fiduciary duty claim as a creditor, the trial court must find CTS was insolvent, or must find that, as a result of the distributions, it would become insolvent.

If the trial court makes such a finding of insolvency, then we conclude that Kamins, from the time of CTS's insolvency, had a duty to manage its assets as a trustee for the corporation's creditors. Under such circumstances, we further conclude Paratransit would have standing to sue Kamins for breach of a common law fiduciary duty.

## V. Amount of the Distribution

Kamins next contends that even if his June 3, 1998 distribution rendered CTS insolvent, the trial court erred in failing to calculate the amount CTS could have distributed while remaining solvent. We agree.

█ Section 7–108–403(1), C.R.S.2006, provides that a director is personally liable to the corporation only for that portion of the distribution which makes the corporation insolvent. Thus, on remand, if the trial court finds CTS insolvent as a result of one or both of Kamins's distributions to himself, the court must determine how much of the distribution, if any, could have been paid while leaving the corporation solvent.

## VI. Prejudgment Interest

Because it may arise on remand, we address Kamins's contention that the trial court erred in awarding prejudgment interest from May 28, 1998. He maintains that prejudgment interest should have been calculated to

start no earlier than December 14, 1998. We agree in part.

Section 5–12–102(1)(b), C.R.S.2006, permits a creditor to recover prejudgment interest from the time the money is wrongfully withheld or becomes due. *See also Mesa Sand & Gravel Co. v. Landfill, Inc.*, 776 P.2d 362 (Colo.1989).

█ In determining when payment is wrongfully withheld, "either formal demand or circumstances demonstrating a reasonable expectation of payment render[ ] nonpayment wrongful." *Karg v. Mitchek*, 983 P.2d 21, 27 (Colo.App.1998). Any dispute over the dates should be determined by the trial court in its order awarding interest. *Burt v. Beautiful Savior Lutheran Church*, 809 P.2d 1064 (Colo.App.1990).

Paratransit's motion for entry of final judgment proposed that prejudgment interest should accrue from May 28, 1998. The trial court granted the motion. However, after reviewing the record, we conclude there are several dates when the various monies could have become due to Paratransit, including (1) the date(s) premiums were due under the terms of the policy; (2) the date(s) CTS was required to pay sums due under the SIR; and (3) the date(s) CTS was required to pay sums due under the policy on the open cases.

We therefore conclude the trial court erred in finding that May 28, 1998 was the date from which all interest would accrue. Accordingly, if on remand the trial court again finds Kamins liable, the court must recalculate the prejudgment interest. If the trial court cannot determine exact dates when damages were incurred, it should select a reasonably intermediate date from which to award prejudgment interest. *See Pegasus Helicopters, Inc. v. United Technologies Corp.*, 35 F.3d 507 (10th Cir.1994).

## VII. Expert Witness Fees and Costs

Because the issue raised in Paratransit's cross-appeal may arise on remand, we address it. Paratransit contends that, pursuant to § 13–17–202(1)(a)(I), C.R.S.2006, the trial court erred in denying any costs related to its expert because (1) it was the prevailing

party; and (2) it recovered more than its settlement offer. We agree.

The prevailing plaintiff is entitled to recover costs against the defendant. § 13–16–104, C.R.S.2006.

In addition, § 13–17–202(1)(a) provides:

(I) If the plaintiff serves an offer of settlement in writing at any time more than fourteen days before the commencement of the trial that is rejected by the defendant, and the plaintiff recovers a final judgment in excess of the amount offered, then the plaintiff shall be awarded actual costs accruing after the offer of settlement to be paid by the defendant.

(II) If the defendant serves an offer of settlement in writing at any time more than fourteen days before the commencement of the trial that is rejected by the plaintiff, and the plaintiff does not recover a final judgment in excess of the amount offered, then the defendant shall be awarded actual costs accruing after the offer of settlement to be paid by the plaintiff.

Nevertheless, "the trial court [has] discretion over the amount of costs to be awarded and may disallow certain requested costs as unreasonable so long as the court includes in the record its reasons for doing so." *Bennett v. Hickman,* 992 P.2d 670, 673 (Colo.App.1999). Further, if expert testimony is "given in good faith and ... the work in support of the testimony has been professionally and diligently performed, the question of costs concerning that witness' work and testimony should not be governed by issues of credibility, but rather must be determined strictly on the reasonableness of the fees." *Bennett v. Hickman, supra,* 992 P.2d at 673–74.

Here, the trial court made no finding that the testimony of Paratransit's expert witness was incredible, or that the fees were unreasonable. Accordingly, we conclude that the trial court erred in denying Paratransit's costs. On remand, should Paratransit prevail and recover judgment in excess of the amount offered, it is also entitled to actual costs, including the costs related to its expert witness, accruing after its offer of settlement to Kamins.

The judgment is reversed, and the case is remanded for further proceedings consistent with the views expressed in this opinion.

Judge CASEBOLT and Judge VOGT concur.